AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of New Jersey

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| JAMES WESSELS | ) | Case No. |
| | ) | 23-mj-2054 (AMD) |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___June 2021 through Sept. 2021___ in the county of ___Camden___ in the _____ District of ___New Jersey___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |
| | See Attachment A. |

This criminal complaint is based on these facts:

See Attachment B

☑ Continued on the attached sheet.

_____
_Complainant's signature_

SA James Greczek, FDIC-OIG
_Printed name and title_

Sworn to before me and signed in my presence.

Date: ___07/12/2023___

_____
_Judge's signature_

City and state: ___Camden, New Jersey___

Hon. Ann Marie Donio, U.S. Magistrate Judge
_Printed name and title_

CONTENTS APPROVED
UNITED STATES ATTORNEY

By:

Daniel A. Friedman
Assistant U.S. Attorney

Date:  July 7, 2023

## **Attachment A**

### Count 1
(Conspiracy to Commit Money Laundering)

From in or about June 2021 through in or about September 2021, in Camden County, in the District of New Jersey, and elsewhere, the defendant,

### JAMES WESSELS

did knowingly conspire and agree with ERIC RIVERA, LISA SMITH, SIEFF ROBERT SARGEANT, CC-1, and others, to knowingly conduct and attempt to conduct financial transactions, which in fact involved the proceeds of specified unlawful activity, that is, bank fraud, in violation of Title 18, United States Code, Section 1344, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i), as described in Attachment B..

In violation of Title 18, United States Code, Section 1956(h).

**ATTACHMENT B**

1.     I, James Greczek, am a Special Agent with the Federal Deposit Insurance Corporation – Office of Inspector General. I have knowledge of the facts set forth below as a result of my participation in this investigation as well as from my review of reports from, and discussions with, other law enforcement personnel. Where statements of others are related herein, they are related in substance and in part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

**OVERVIEW**

2.     Defendants Eric Rivera, Lisa Smith, Adrienne Ponzo, James Wessels, and others, devised and executed a scheme to fraudulently obtain multiple loans through federal government programs referred to as the Paycheck Protection Program ("PPP") and Economic Injury Disaster Loans ("EIDL"). In addition, defendants Eric Rivera, Lisa Smith, Adrienne Ponzo, James Wessels, Sieff Robert Sargeant, and others laundered the illegally-obtained loan proceeds.

**BACKGROUND OF FEDERAL COVID-19 RELIEF PROGRAMS**

**A. The Paycheck Protection Program**

3.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and was designed to provide emergency financial assistance to the millions of Americans who suffered the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

4.     To obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business. The applicant of a PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. For example, applicants were required to agree to the following certifications (emphasis added):

> The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the

1

Paycheck Protection Program Rules; **I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.**

**I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law,** including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, **if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000**

**Any and all information and supporting documentation provided by Borrower to Lender is and shall be true, accurate and complete in all respects**

5.    In the PPP loan application, the applicant had to state, among other things, its average monthly payroll expenses and number of employees. These figures were used to calculate the amount of money the business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses.

6.    A PPP loan application had to be processed by a participating financial institution (the lender). If the PPP loan application was approved, the lender funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

7.    PPP loan proceeds could only be used by the business for certain permissible expenses, including payroll costs, interest on mortgages, rent, and utilities. The PPP program allowed the interest and principal to be forgiven if businesses spent the proceeds on these expenses within 24 weeks of receipt, used at least 60% of the forgiven amount for payroll, and used up to 40% of the forgiven amount for eligible non-payroll expenses.

2

8.      To obtain loan forgiveness of a loan in the amount of $150,000 or less, a borrower was required to submit a PPP Loan Forgiveness Application Form 3508S. Form 3508S required the borrower to report the amount of loan proceeds spent on payroll costs.  It also required the borrower to certify that:

> The information provided in this application is true and correct in all material respects. I understand that knowingly making a false statement to obtain forgiveness of an SBA-guaranteed loan is punishable under the law, including 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a Federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

## B. The Economic Injury Disaster Loan Program

9.      The Economic Injury Disaster Loan ("EIDL") program is an SBA program that provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

10.      The CARES Act authorized the SBA to provide EIDLs of up to $2 million to eligible small businesses that were experiencing substantial financial disruption due to the COVID-19 pandemic.

11.      To obtain an EIDL, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster (which began on February 1, 2020), and cost of goods sold in the 12-month period preceding the disaster.  In addition, the business entity must have been in operation on February 1, 2020.

12.      The amount of the EIDL was determined based, in part, on the information provided by the applicant regarding the revenue, employees, and cost of goods of the business.  The SBA directly issued any funds disbursed under an EIDL to the applicant business.  A business was permitted to use EIDL funds for payroll expenses, sick leave, production costs, and business obligations such as debts, rent, and mortgage payments.  If a business also obtained a PPP loan, the business was prohibited from using EIDL funds for the same purpose as PPP funds.

3

## THE DEFENDANTS AND CO-CONSPIRATORS

13.    Defendant Eric Rivera resided in Norcross, Georgia. Defendant Eric Rivera received approximately $285,000 in PPP funds directly from participating lenders as the reported owner of several businesses. Additionally, defendant Eric Rivera received approximately $517,589 in PPP and EIDL funds that were paid to businesses with other owners whom defendant Eric Rivera recruited into the scheme. There is probable cause to believe that these funds received from businesses with other owners were kickbacks for his role in coordinating this scheme to fraudulently obtain PPP and EIDL loans.

14.    Defendant Lisa Smith resided in Cornelius, North Carolina. Defendant Lisa Smith prepared and submitted fraudulent PPP loan applications as part of the scheme. Defendant Lisa Smith received approximately $125,000 in PPP funds directly from participating lenders as the reported owner of several businesses. Additionally, defendant Lisa Smith received at least $43,000 for her role in submitting PPP applications on behalf of businesses with other owners, some of whom were introduced to defendant Lisa Smith by defendant Eric Rivera.

15.    Defendant Adrienne Ponzo resided in Dallas, Georgia. Defendant Adrienne Ponzo prepared and submitted fraudulent EIDL loan applications as part of the scheme and received at least $70,000 for her role in submitting EIDL applications on behalf of businesses with other owners, some of whom were introduced to defendant Adrienne Ponzo by defendant Eric Rivera.

16.    Defendant James Wessels resided in Middletown, Delaware. Defendant James Wessels prepared forged tax returns that were submitted as part of certain PPP applications and prepared fraudulent payroll documents as part of the scheme to launder the proceeds of the fraudulent loan scheme.

17.    Defendant Sieff Robert Sargeant resided in Island Park, New York. Defendant Sieff Robert Sargeant received approximately $147,000 in PPP funds directly from a participating lender based on a fraudulent loan application. Defendant Sieff Robert Sargeant subsequently conspired with defendant James Wessels and others to launder the proceeds of the PPP loan.

18.    Co-Conspirator 1 (hereinafter "CC-1"), who was a co-conspirator but not named as a defendant herein, resided in Haddonfield, New Jersey. CC-1 was introduced to defendants Lisa Smith and Adrienne Ponzo through defendant Eric Rivera and received three PPP loans based on fraudulent applications prepared by defendant Lisa Smith and one EIDL loan based on a fraudulent application prepared by defendant Adrienne Ponzo. CC-1 subsequently conspired with defendants Eric

4

Rivera, Lisa Smith, and James Wessels to launder the proceeds from his fraudulent PPP loans.

19.    Co-Conspirator 2 (hereinafter "CC-2"), who was a co-conspirator but not named as a defendant herein, resided in Phoenix, Arizona. CC-2 was introduced to defendants Lisa Smith and Adrienne Ponzo through defendant Eric Rivera. CC-2 received approximately $147,100 in EIDL funds directly from the SBA as the reported owner of a business he controlled based on a fraudulent application prepared by defendant Adrienne Ponzo. Additionally, CC-2 received approximately $80,230 in PPP and EIDL funds that were paid to businesses with other owners whom CC-2 introduced to defendant Eric Rivera based on fraudulent applications prepared by defendants Adrienne Ponzo and Lisa Smith. There is probable cause to believe that these funds received from other businesses were kickbacks for his role in recruiting other individuals to participate in this scheme to fraudulently obtain PPP and EIDL loans.

20.    Co-Conspirator 3 (hereinafter "CC-3"), who was a co-conspirator but not named as a defendant herein, resided in Nashville, Tennessee. CC-2 recruited CC-3 to apply for and receive one EIDL loan based on a fraudulent application.

21.    Co-Conspirator 4 (hereinafter "CC-4"), who was a co-conspirator but not named as a defendant herein, resided in Hartford, Connecticut. CC-2 recruited CC-4 to apply for and receive one PPP loan based on a fraudulent application.

22.    Co-Conspirator 5 (hereinafter "CC-5"), who was a co-conspirator but not named as a defendant herein, resided in Bloomfield, Connecticut. CC-2 recruited CC-5 to apply for and receive one PPP loan based on a fraudulent application.

23.    Co-Conspirator 6 (hereinafter "CC-6"), who was a co-conspirator but not named as a defendant herein, resided in Lawnside, New Jersey. CC-6's business received one PPP loan based on a fraudulent application.

## PROBABLE CAUSE

### A. Fraudulent PPP and EIDL Loans[1]

#### a. One World Read PPP Loan

24.    According to a limited liability agreement, One World Read LLC was a Delaware limited liability company and defendant Eric Rivera is a member with

---

[1] The loans described in this affidavit are not all of the fraudulent loans identified during the course of this investigation.

100% interest. In March 2021, defendants Eric Rivera and Lisa Smith worked together to apply for a $140,000 PPP loan from a participating financial institution, Financial Institution-7[2] on behalf of One World Read LLC.

25.    The One World Read PPP application stated that defendant Eric Rivera was 100% owner of One World Read and One World Read had 11 employees with a monthly average payroll of $60,000. It also included purported tax Forms 941, for all four quarters of 2020, for One World Read.[3] On the Forms 941, One World reported paying 11 employees $172,500 in wages, tips, and other compensation each quarter of 2020, which equals an average monthly payroll of $57,500. Defendant Eric Rivera signed the Forms 941 as the "Owner."

26.    On April 22, 2021, the One World Read PPP application was approved and Financial Institution-7 disbursed approximately $140,000 into a checking account at Financial Institution-7 in the name of One World Read, which per bank records was controlled by defendant Eric Rivera.

27.    The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the One World Read PPP application was fraudulent. According to federal tax records obtained from the Internal Revenue Service ("IRS"), the IRS has no record of any Forms 941 having been filed for One World from 2018 through 2021. Furthermore, the IRS has no record of any federal tax records having been filed for defendant Eric Rivera for the years 2019 through 2021. Information obtained from the Social Security Administration ("SSA") revealed that One World Read reported no wages paid for the period from 2018 through 2021.

28.    On the One World Read PPP application, defendant Eric Rivera stated that the purpose of the loan was to pay for payroll costs, rent/mortgage interest, utilities, covered operations expenses, and covered supplier costs. An analysis of the Financial Institution-7 One World Read account where the loan proceeds were disbursed reveals that within one month of the $140,000 deposit, approximately $103,885 was transferred to a business checking account at Financial Institution-1 in the name One World Read with defendant Eric Rivera as the sole signatory. The

---

[2] Financial Institution-7 was a "financial institution" within the meaning of Title 18, United States Code, Section 20.

[3] A Form 941 is a quarterly report, filed with the Internal Revenue Service (IRS), used to report the number of employees who received wages, tips, and compensation, a business's quarterly wages, tips, and compensation paid and Federal income tax withheld.

6

remainder of the money in the Financial Institution-7 One World Read account was spent on cash withdrawals and hotel and airline expenses.

29.    An analysis of statements for the Financial Institution-1 One World Read account reveals that in addition to the One World Read PPP loan proceeds, proceeds from other fraudulent PPP and EIDL loans (which will be discussed in this affidavit) were deposited into the Financial Institution-1 One World Read bank account. The loan proceeds were spent at a jewelry store, a clothing retailer, and on cash withdrawals, restaurants, travel, hotels, and casinos.

b.    Precis Laboratory PPP Loan

30.    According to public records, Precis Laboratory LLC was a Georgia limited liability company controlled by defendant Eric Rivera. In March 2021, defendants Eric Rivera and Lisa Smith worked together to apply for a $145,000 PPP loan from Financial Institution-7 on behalf of Precis Laboratory.

31.    The Precis Laboratory PPP application stated that Precis Laboratory had 14 employees with a monthly average payroll of $59,000. It also included purported 2020-year tax Forms 941 for Precis Laboratory for all four quarters of 2020, on which Precis Laboratory reported paying 14 employees $175,000 in wages , tips, and other compensation quarterly, which equals an average monthly payroll of approximately $58,333. Defendant Eric Rivera signed the Forms 941 as the "Owner".

32.    On April 12, 2021, the Precis Laboratory PPP loan was approved and Financial Institution-7 disbursed approximately $145,000 to a Financial Institution-7 checking account in the name of Precis Laboratory. Defendant Eric Rivera was the only signatory on the account.

33.    The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the Precis Laboratory PPP application was fraudulent. According to federal tax records obtained from the IRS, the IRS has no record of any Forms 941 having been filed for Precis Laboratory from 2018 through 2021. Information obtained from the SSA revealed that Precis Laboratory reported no wages paid for the period from 2018 through 2020.

34.    On the Precis Laboratory PPP loan application, defendant Eric Rivera stated that the purpose of the loan was to pay for payroll costs, rent/mortgage interest, utilities, covered operations expenses, and covered supplier costs. An analysis of bank records for the Financial Institution-7 Precis Laboratory account shows that within one month of the disbursement of the Precis Laboratory PPP loan, approximately $103,330 was transferred to a business checking account at Financial

7

Institution-1 in the name of Precis Laboratory with defendant Eric Rivera as the sole signatory. The majority of the money remaining in the Financial Institution-7 Precis Laboratory account was withdrawn via cash withdrawals.

35.     An analysis of statements for Financial Institution-1 Precis Laboratory account reveals that in addition to the Precis Laboratory proceeds, proceeds from other fraudulent PPP and EIDL loans (which will be discussed in this affidavit) were deposited into the account. The loan proceeds were spent at a jewelry store, a clothing retailer, and on cash withdrawals, restaurants, travel, hotels, and casinos.

c. 242 Dreamer, LLC PPP Loan

36.     According to public records, 242 Dreamer, LLC was a Delaware limited liability company controlled by defendant Lisa Smith. In February 2021, defendant Lisa Smith applied for a $50,000 PPP loan from Financial Institution-7 on behalf of 242 Dreamer.

37.     The 242 Dreamer PPP application stated that 242 Dreamer had 7 employees with a monthly average payroll of $25,000.

38.     On March 15, 2021, the 242 Dreamer PPP loan was approved and Financial Institution-7 disbursed approximately $50,000 to a Financial Institution-7 checking account in the name of 242 Dreamer. Defendant Lisa Smith was the only signatory on the account.

39.     The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the 242 Dreamer PPP application was fraudulent. According to federal tax records obtained from the IRS, the IRS has no record of any Forms 941 having been filed for 242 Dreamer from 2018 through 2021. Furthermore, information obtained from the SSA revealed that 242 Dreamer reported no wages paid for the period from 2018 through 2022.

40.     On 242 Dreamer PPP loan application, defendant Lisa Smith stated that the purpose of the loan was to pay for payroll costs, rent/mortgage interest, utilities, covered operations expenses, and covered supplier costs. An analysis of bank records for the Financial Institution-7 242 Dreamer account shows that the majority of the loan proceeds were withdrawn via checks payable to 242 Dreamer, transfers to a Financial Institution-7 personal account in defendant Lisa Smith's name, and cash withdrawals.

d. <u>Dash My Hair, LLC PPP Loan</u>

41.     According to public records, Dash My Hair LLC was a Delaware limited liability company controlled by defendant Lisa Smith. In March 2021, defendant Lisa Smith applied for a $75,000 PPP loan from Financial Institution-7 on behalf of Dash My Hair.

42.     The Dash My Hair PPP application stated that Dash My Hair had 12 employees with a monthly average payroll of $31,500. It also included purported 2019 Forms 941 for Dash My Hair for all four quarters of 2019, on which Dash My Hair reported paying 12 employees $95,029 in wages, tips, and other compensation each quarter of 2019, which equals an average monthly payroll of approximately $23,757. Defendant Lisa Smith signed the Forms 941 as the "Owner".

43.     On March 15, 2021, the same day that the 242 Dreamer PPP loan was approved, the Dash My Hair loan was approved and Financial Institution-7 disbursed approximately $75,000 to the Financial Institution-7 checking account in the name of 242 Dreamer. On March 25, 2021, a transfer of $75,000 was made from the 242 Dreamer Financial Institution-7 account to an account at Financial Institution-7 in the name of Dash My Hair. Defendant Lisa Smith was the only signatory on both accounts.

44.     The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the Dash My Hair PPP application was fraudulent. According to federal tax records obtained from the IRS, the IRS has no record of any Forms 941 having been filed for Dash My Hair from 2018 through 2021. Information obtained from the SSA revealed that Dash My Hair reported no wages paid for the period from 2018 through 2022.

e. <u>Business-1 EIDL Loan</u>

45.     In October 2020, defendant Eric Rivera provided defendant Adrienne Ponzo's contact information to CC-1 and told CC-1 to contact defendant Adrienne Ponzo so that defendant Adrienne Ponzo could assist CC-1 in preparing EIDL loan applications for CC-1's businesses. Defendant Eric Rivera followed up with a message to CC-1 on October 28, 2020 stating "Go get that bread bro... You know what to do with it."

46.     On December 3, 2020, an EIDL loan application was submitted to SBA on behalf of Business-1. Per records on file with the State of New Jersey, Business-1 was a New Jersey limited liability company and Individual-1 is identified as the

managing member.[4] The Business-1 EIDL application listed a business address on Stevens Street in Camden, New Jersey.

47.     The Business-1 EIDL application stated that Business-1 had one employee, gross revenues of $283,009 for the 12 months prior to the disaster (January 31, 2020), and cost of goods sold of $0 for the 12 months prior to the disaster.

48.     A purported 2019 Form 1040 U.S. Individual Income Tax Return for Individual-1 was submitted to the SBA as a part of the Business-1 EIDL application. The Form 1040 listed $283,009 in gross receipts from Business-1 and approximately $66,000 in net profit from Business-1. The investigation has confirmed that this tax return was fraudulent, it was never filed with the IRS, and that Individual-1 received no income from Business-1 in 2019.

49.     Prior to submitting the Business-1 EIDL application, CC-1 and defendant Eric Rivera discussed that defendant Adrienne Ponzo could forge tax documents to support the loans. On October 28, 2020, CC-1 messaged defendant Eric Rivera, "I have not [sic] taxes on the 3 Buisness [sic] I know u said they charge about 3 to 500 to do so if needed not a problem". Based on my training and experience and knowledge of this investigation, I believe that CC-1 was admitting to defendant Eric Rivera that he/she had not filed income tax returns for his/her businesses and that he/she was confirming that defendant Eric Rivera had someone who could prepare fraudulent income tax returns for a fee. In subsequent conversations, defendant Eric Rivera assured CC-1 that defendant Adrienne Ponzo would be preparing the tax forms.

50.     On December 11, 2020, the Business-1 EIDL loan was approved and the SBA disbursed approximately $141,500 into a Financial Institution-2 bank account in the name of Business-1, for which CC-1 was the sole signatory.

51.     In November 2020, defendants Eric Rivera and Adrienne Ponzo discussed the kickback that they would charge CC-1 for obtaining the Business-1 loan. They agreed that the fee charged to CC-1 would be 20 percent of the loan proceeds because defendant Adrienne Ponzo had to create false documents in order

---

[4] According to public records on file with the State of New Jersey, Business-1's original certificate of formation, dated 09/13/2012, listed CC-1 as the registered agent and authorized representative. Just before Business-1 applied for the EIDL loan, CC-1 was removed as registered agent and authorized representative and was replaced by Individual-1.

to get the loan approved. (Otherwise, if she did not have to forge documents, they agreed that the price would be 15 percent).

      f.  Business-1 PPP Loan

52.     In October 2020, defendant Eric Rivera connected CC-1 with defendant Lisa Smith and identified defendant Lisa Smith as someone who would assist CC-1 in obtaining PPP loans for CC-1's businesses. Defendant Lisa Smith and CC-1 subsequently agreed to submit three fraudulent PPP loan applications for CC-1's businesses.

53.     On March 19, 2021, Lisa Smith submitted—and CC-1 electronically signed—a PPP loan application to Financial Institution-7 on behalf of Business-1. The application listed Business-1's business address on Stevens Street in Camden, New Jersey. Business-1 reported seven employees and an average monthly payroll of $48,916. The stated purpose of the loan was to pay for payroll costs, rent/mortgage interest, utilities, and covered operations expenses, and covered supplier costs. The application was submitted in the name of Individual-1.

54.     The Business-1 PPP application also included purported 2019 Forms 941 in the name of Business-1. Per the Forms 941, Business-1 reported paying seven employees $146,750 in wages, tips, and other compensation each quarter of 2019, which equals an average monthly payroll of approximately $36,687.50.

55.     The investigation has revealed that these Forms 941 were fraudulent and were created by defendant Lisa Smith for the purpose of submitting them to the PPP lender. On March 19, 2021, defendant Lisa Smith emailed CC-1 four Forms 941 for Business-1, one for each quarter of 2019. CC-1 signed each of them (in his own name even though the printed name on the Forms 941 was Individual-1) and they were then uploaded as part of the Business-1 PPP loan application. Further, according to federal tax records obtained from the IRS, the IRS has no record of any Forms 941 having been filed for Business-1 from 2018 through 2021.

56.     In April 2021, defendant Lisa Smith and CC-1 worked to submit additional supporting documentation for the Business-1 PPP application. Financial Institution-7 requested an operating agreement for Business-1, which CC-1 did not have. Defendant Lisa Smith messaged CC-1 "I can do it for you … No worries … I have a template." Defendant Lisa Smith subsequently messaged CC-1: "Well, they are asking everyone now to do an Op Agreement. They only asked for one of your companies right now. To be proactive and efficient, I did one for each company and wanted to load it in the portal so it doesn't waste time with them having to stop and

ask." An operating agreement that defendant Lisa Smith generated was submitted as part of the Business-1 PPP application.

57.     On May 4, 2021, Business-1 was approved for a PPP loan in the amount of $122,000. The loan proceeds were disbursed to a Financial Institution-7 business checking account in the name of Business-1, which was controlled by CC-1.

58.     The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the Business-1 PPP application was fraudulent. Information obtained from the SSA revealed that Business-1 reported paying no wages for the period from 2018 through 2020.

59.     On May 17, 2021, a $7,500 check with memo line "Wholesale Product Lines and Regional Product" and a $10,800 check with a memo line "Marketing Promotions", from a Business-1 Financial Institution-7 account, made payable to Nothing Much LLC, were deposited into a Nothing Much LLC bank account at Financial Institution-3 that was controlled by defendant Eric Rivera.

g.  Business-2 PPP Loan

60.     On April 3, 2021, defendant Lisa Smith submitted—and CC-1 electronically signed—a PPP loan application to Financial Institution-7 on behalf of Business-2. According to public records filed with the State of New Jersey, Business-2 was a New Jersey limited liability company and Individual-2 was the registered agent, officer, and director.[5] Business-2's business address was listed as a single family residence in Haddonfield, New Jersey.

61.     Business-2 reported 14 employees and an average monthly payroll of $61,000. The stated purpose of the loan was to pay for payroll costs, rent/mortgage interest, utilities, and covered operations expenses, and covered supplier costs.

62.     The Business-2 PPP application also included purported 2019 Forms 941 in the name of Business-2, which reported paying 14 employees $182,250 in wages, tips, and other compensation each quarter of 2019, which equals an average monthly payroll of approximately $60,750.

63.     These Forms 941 were fraudulent and created by defendant Lisa Smith for the purposes of submitting them to the PPP lender. On March 18, 2021,

---

[5] According to public records, shortly before Business-2 applied for the PPP loan, CC-1 was removed as registered agent and Individual-2 replaced CC-1 as registered agent, officer, and director.

defendant Lisa Smith emailed CC-1 four forged Forms 941 for Business-2, one for each quarter of 2019. CC-1 signed each of them and they were then uploaded as part of the Business-2 PPP loan application. Further, according to federal tax records obtained from the IRS, the IRS has no record of any Forms 941 having been filed for Business-2 from 2018 through 2021.

64.     On April 20, 2021, Business-2 was approved for a PPP loan in the amount of $145,000.   The loan proceeds were disbursed to a Financial Institution-7 business checking account in the name of Business-2, which was controlled by CC-1. On May 17, 2021, a $12,750 check and a $9,000 check, both from Business-2, for a total of $21,750, were deposited into defendant Eric Rivera's One World Read LLC bank account at Financial Institution-1.

65.     The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the Business-2 PPP application was fraudulent.  Information obtained from the SSA revealed that Business-2 reported no wages paid for the period between 2018 through 2021.

h.  <u>Business-3 LLC PPP Loan</u>

66.     On March 18, 2021, defendant Lisa Smith submitted—and CC-1 electronically signed—a PPP loan to Financial Institution-7 on behalf of Business-3. According to public records, Business-3 was a New Jersey limited liability company and CC-1 was the registered agent and sole authorized representative. Business-3's business address was listed as a residential property in Camden, New Jersey.

67.     Business-3 reported 18 employees and an average monthly payroll of $58,000.  The stated purpose of the loan was to pay for payroll costs, rent/mortgage interest, utilities, and covered operations expenses, and covered supplier costs.

68.     The Business-3 PPP application also included purported 2019 Forms 941 in the name of Business-3, which reported paying 18 employees $172,250 in wages, tips, and other compensation each quarter of 2019, which equals an average monthly payroll of approximately $57,416.  Business-3's 2019 Forms 941 listed an address of a single family residence in Haddonfield, New Jersey.  CC-1 signed the Forms 941 as the "Owner".

69.     These Forms 941 were fraudulent and created by defendant Lisa Smith for the purposes of submitting them to the PPP lender.  On March 18, 2021, defendant Lisa Smith emailed CC-1 four Forms 941 for Business-3, one for each quarter of 2019.  CC-1 signed each of them and they were then uploaded as part of the Business-3 PPP loan application.  Further, according to federal tax records

obtained from the IRS, the IRS has no record of any Forms 941 having been filed for Business-3 from 2018 through 2021.

70.     On April 12, 2021, Business-3 was approved for a PPP loan in the amount of $143,000.  The loan proceeds were disbursed to a Financial Institution-7 business checking account in the name of Business-3, which was controlled by CC-1.  On April 20, 2021, a $21,450 wire from Business-3's bank account was deposited into defendant Eric Rivera's Precis Laboratory bank account at Financial Institution-1.

71.     The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the Business-3 PPP application was fraudulent.  Information obtained from the SSA revealed that Business-3 reported no wages paid for the period between 2018 through 2021.

### i. Coach Sargeant Training PPP Loan

72.     According to public records, defendant Sieff Robert Sargeant was the sole member and owner of Coach Sargeant Training LLC, a New York limited liability company.  In March 2021, CC-1 referred defendant Sieff Robert Sargeant to defendants Eric Rivera and Lisa Smith for the purpose of defendants Eric Rivera and Lisa Smith assisting defendant Sieff Robert Sargeant in obtaining a PPP loan for Coach Sargeant Training LLC.

73.     On April 27, 2021, defendant Lisa Smith submitted—and defendant Sieff Robert Sargeant electronically signed—a PPP loan application to Financial Institution-7 on behalf of Coach Sargeant Training LLC.

74.     Coach Sargeant Training reported nine employees and an average monthly payroll of $58,800.  The stated purpose of the loan was to pay for payroll costs, rent/mortgage interest, utilities, and covered operations expenses, and covered supplier costs.

75.     The Coach Sargeant Training PPP application also included purported 2019 Forms 941 in the name of Coach Sargeant Training, which reported paying nine employees $177,500 in wages, tips, and other compensation each quarter of 2019, which equals an average monthly payroll of approximately $59,166. Defendant Sieff Robert Sargeant signed the Forms 941 as the "Owner".

76.     These Forms 941 were fraudulent and created by defendant Lisa Smith for the purposes of submitting them to the PPP lender.  On April 25, 2021, defendant Lisa Smith emailed defendant Sieff Robert Sargeant four Forms 941 for Coach Sargeant Training, one for each quarter of 2019.  Defendant Sieff Robert Sargeant signed each of them and they were then uploaded as part of the Coach

Sargeant Training PPP loan application. Further, according to federal tax records obtained from the IRS, the IRS has no record of any Forms 941 having been filed for Coach Sargeant Training from 2018 through 2021.

77.     On May 27, 2021, Coach Sargeant Training was approved for a PPP loan in the amount of $147,000. The loan proceeds were disbursed to a Financial Institution-7 business checking account in the name of Coach Sargeant Training, which is controlled by defendant Sieff Robert Sargeant. On June 21, 2021, a $9,500 check and a $12,500 check, both from Coach Sargeant Training, for a total of $22,000, with the memo lines of "Inventory," were deposited into defendant Eric Rivera's Nothing Much LLC bank account at Financial Institution-3.

78.     The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the Coach Sargeant Training PPP application was fraudulent. Information obtained from the SSA revealed that Coach Sargeant Training reported no wages paid for the period between 2018 through 2020.

j.   Business-4 LLC PPP Loan

79.     CC-6 was the owner of Business-4, a New Jersey limited liability company.

80.     On February 6, 2021, CC-6 submitted a PPP loan application to Financial Institution-8 on behalf of Business-4 seeking a loan for $237,500. CC-6 submitted the application in his name and listed himself as the owner of Business-4.

81.     The Business-4 PPP application reported that Business-4 had 12 employees and had an average monthly payroll of $95,000.

82.     The Business-4 PPP application also included purported 2019 Forms 941 in the name of Business-4, which reported paying 12 employees $300,000 in wages, tips, and other compensation each quarter of 2019, which equals an average monthly payroll of approximately $100,000. CC-6 signed the Forms 941 as the "Owner".

83.     These Forms 941 were fraudulent and created by defendant James Wessels for the purposes of submitting them to the PPP lender. On October 12, 2020, defendant James Wessels emailed CC-6 four Forms 941 for Business-4, one for each quarter of 2019. CC-6 signed each of them and they were then uploaded as part of the Business-4 PPP loan application. On October 13, 2020, CC-6 sent defendant

James Wessels $350 via CashApp[6] to compensate defendant James Wessels for creating the fake Forms 941. According to federal tax records obtained from the IRS, the IRS has no record of any Forms 941 having been filed for Business-4 from 2018 through 2021.

84.    On April 6, 2021, Business-4 was approved for a PPP loan in the amount of $237,500. The loan proceeds were disbursed to a bank account controlled by CC-6. CC-6 subsequently appeared in the United States District Court for the District of New Jersey and pleaded guilty to bank fraud for submitting the fraudulent PPP loan application. He was sentenced to 6 months' imprisonment.

### k. VisionWorks Group of America EIDL loan

85.    In November 2020, CC-2 and defendant Eric Rivera discussed applying for PPP and EIDL loans for businesses controlled by CC-2 (including Y3K Entertainment Group LLC and VisionWorks Group of America) and for businesses controlled by other individuals but referred by CC-2 to defendant Eric Rivera (including Business-5 and Business-6). CC-2 was the owner of Visionworks Group of America LLC ("Visionworks"), a Connecticut company.

86.    On November 7, 2020, defendant Adrienne Ponzo submitted an EIDL loan application to the SBA on behalf of Visionworks. The Visionworks EIDL application stated that Visionworks had one employee, gross revenues of $294,018 for the 12 months prior to the disaster (January 31, 2020), and cost of goods sold of $0 for the 12 months prior to the disaster.

87.    A purported 2019 Form 1040 U.S. Individual Income Tax Return for CC-2 was submitted to the SBA as a part of the Visionworks EIDL application. The Form 1040 listed $294,018 in gross receipts from Visionworks and $73,212 in net profit from Visionworks. The investigation has confirmed that this tax return was fraudulent, it was never filed with the IRS. On November 13, 2020, the fraudulent Form 1040 was sent by email from defendant Adrienne Ponzo to CC-2.

88.    On November 16, 2020, Visionworks was approved for an EIDL loan in the amount of $147,100. On November 20, 20220, the loan proceeds were disbursed into a Financial Institution-4 bank account in the name of Visionworks that is controlled by CC-2.

89.    On November 25, 2020, a $72,000 wire from the Visionworks bank account at Financial Institution-4 was deposited into defendant Eric Rivera's Precis

---

[6] CashApp is a mobile payment service available in the United States that allows users to transfer money to one another using a mobile phone app.

Laboratory bank account at Financial Institution-1. On November 27, 2020, a $15,000 wire from defendant Eric Rivera's Precis Laboratory bank account at Financial Institution-1 was deposited into a bank account controlled by defendant Adrienne Ponzo at Financial Institution-6.

90.     The investigation has revealed that the gross revenue reported to the SBA on the Visionworks EIDL application was fraudulent.

   l.  <u>Business-5 EIDL loan</u>

91.     CC-3 was the owner of Business-5, a Tennessee company. In December 2020, CC-3 spoke with CC-2, who advised CC-3 that defendants Eric Rivera and Adrienne Ponzo could help CC-3 obtain an EIDL loan for Business-5 in exchange for a fee comprising approximately half of the loan amount.

92.     On December 3, 2020, an EIDL loan application was submitted to SBA on behalf of Business-5. The Business-5 EIDL application stated that Business-5 had one employee, gross revenues of $284,303 for the 12 months prior to the disaster (January 31, 2020), and cost of goods sold of $0 for the 12 months prior to the disaster.

93.     According to an income tax return for Business-5 that was provided to me by Business-5, Business-5's actual revenue in 2019 was $80,800 and its business income was $37,276.

94.     On December 16, 2020, Business-5 was approved for an EIDL loan in the amount of $142,200. The loan proceeds were disbursed into a Financial Institution-5 bank account in the name of Business-5 that is controlled by CC-3.

95.     On December 9, 2020, CC-2 messaged defendant Eric Rivera that CC-3 "is through the process. Let me know what she must wire back to you and please send her the invoice to her company email so she won't have any issue with the wire at her bank." CC-2 subsequently messaged defendant Eric Rivera the name of CC-3's company, her phone number, and her email address. Later on December 9, 2020, defendant Eric Rivera sent CC-2 an invoice from Precis Laboratory to Business-5 purportedly billing Business-5 $71,300 for 400,000 disposable protective surgical face masks. The investigation has revealed that this invoice was a sham and Business-5 did not actually supply any face masks to Precis Laboratory.

96.     On December 15, 2020, CC-2 messaged defendant Eric Rivera, "[CC-3] received her deposit. I told her to go in tomorrow with the invoice and do the wire… Like you suggested I told [CC-3] to wait 24 hrs before sending wire."

97.    On December 16, 2020, a $71,300 wire from the Business-5 bank account at Financial Institution-5 was deposited into defendant Eric Rivera's Precis Laboratory bank account at Financial Institution-1. On December 17, 2020, a $14,330 wire was sent from defendant Eric Rivera's Precis Laboratory bank account at Financial-Institution-1 to a bank account at Financial Institution-6 controlled by defendant Adrienne Ponzo.

98.    On December 18, 2020, a $20,000 wire with the memo "Pro Audio Vendor" from the Business-5 bank account at Financial Institution-5 was deposited into a Financial Institution-2 bank account in the name of Y3K Entertainment at Financial Institution-2 Bank, which was controlled by CC-2. On December 29, 2020, $3,000 was transferred from the Business-5 bank account at Financial Institution-5, via Zelle,[7] to CC-2.

99.    The investigation has revealed that the revenue and tax forms submitted to the SBA on the Business-5 EIDL application were fraudulent.

m. Y3K Entertainment Group LLC PPP Loan

100.    In December 2020, defendant Eric Rivera referred CC-2 to defendant Lisa Smith to assist CC-2 in applying for PPP loans.

101.    Y3K Entertainment Group, LLC was an Ohio limited liability company. In December 2020, CC-2 messaged defendant Eric Rivera that Y3K was "[m]y company" but that he would be "using [CC-4] as front person" for the PPP application.

102.    On March 19, 2021, a PPP loan application was submitted to Financial Institution-7 on behalf of Y3K Entertainment Group.

103.    Y3K Entertainment Group reported 18 employees and an average monthly payroll of $59,000. The stated purpose of the loan was to pay for payroll costs, rent/mortgage interest, utilities, and covered operations expenses, and covered supplier costs.

104.    The Y3K Entertainment Group application also included purported 2019 Forms 941 in the name of Y3K Entertainment Group which reported paying 18 employees $172,500 in wages, tips, and other compensation each quarter of 2019,

---

[7] Zelle is a payment service available in the United States that allows users to transfer money to one another directly between bank accounts using a mobile phone number or email address.

which equals an average monthly payroll of approximately $57,500. CC-4 purportedly signed the Forms 941 as the "Owner."

105.    These Forms 941 were fraudulent and created for the purposes of submitting them to the PPP lender. According to federal tax records obtained from the IRS, the IRS has no record of any Forms 941 having been filed for Y3K Entertainment Group from 2018 through 2021.

106.    On June 15, 2021, Y3K Entertainment Group was approved for a PPP loan in the amount of $145,000. The loan amount was disbursed to a Financial Institution-7 business checking account in the name of Y3K Entertainment Group, which was used by CC-4. On June 21, 2021, a $29,549 check from Y3K with the memo "Vendor," was deposited into defendant Eric Rivera's Nothing Much LLC bank account at Financial Institution-3. In addition, on June 21, 2021, two checks for $29,549 and $31,451 from Y3K Entertainment Group with the memo lines "Purchase of Tech Equipment – 2B" and "Purchase of Tech Equipment 1A" were deposited into the Precis Laboratory bank account at Financial Institution-1, which was controlled by defendant Eric Rivera.

107.    Besides the payments to defendant Eric Rivera, the Y3K Entertainment Group PPP loan proceeds were used to wire and send CashApp payments to CC-2, purchase jewelry, and to make ATM cash withdrawals.

108.    The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the Y3K Entertainment Group PPP application was fraudulent. Information obtained from the SSA revealed that Y3K Entertainment Group reported no wages paid for the period between 2018 through 2020.

n.   Business-6 PPP loan

109.    Business-6 was a Connecticut limited liability company controlled by CC-5. On March 19, 2021, a PPP loan application was submitted to Financial Institution-7 on behalf of Business-6. The application was prepared by defendant Lisa Smith.

110.    Business-6 reported 13 employees and an average monthly payroll of $58,750. The stated purpose of the loan was to pay for payroll costs, rent/mortgage interest, utilities, and covered operations expenses, and covered supplier costs.

111.    The Business-6 PPP application also included purported 2019 Forms 941 in the name of Business-6, which reported paying 13 employees $176,250 in wages, tips, and other compensation each quarter of 2019, which equals an average

19

monthly payroll of approximately $58,750. CC-5 purportedly signed the Forms 941 as the "Owner."

112. These Forms 941 were fraudulent and created for the purposes of submitting them to the PPP lender. According to federal tax records obtained from the IRS, the IRS has no record of any Forms 941 having been filed for Business-6 from 2019 through 2021.

113. On April 20, 2021, Business-6 was approved for a PPP loan in the amount of $145,000. The loan amount was disbursed to a Financial Institution-7 business checking account in the name of Business-6, which was controlled by CC-5. On April 23, 2021, a $72,500 wire from the Business-6 bank account was received by the Precis Laboratory bank account at Financial Institution-1, which was controlled by defendant Eric Rivera. Also on April 23, 2021, a $10,000 wire from Business-6 was received by the Visionworks Group bank account at Financial Institution-4, which was controlled by CC-2.

114. The investigation has revealed that the employee and wage information submitted to Financial Institution-7 on the Business-6 PPP application was fraudulent. Information obtained from the SSA revealed that Business-6 reported no wages paid for the period between 2018 through 2020.

## B. Laundering of Loan Proceeds

115. As described above, a portion of the PPP and EIDL loan proceeds were distributed as kickbacks or payment for various co-conspirators' roles in obtaining the loans. In total, Eric Rivera received at least $800,000 for PPP loans for his own businesses and kickbacks from others.

116. Defendant Lisa Smith received at least $43,000 in payments after individuals received fraudulent PPP loans based on applications she prepared.

117. Defendant Adrienne Ponzo received at least $70,000 in payments after individuals received fraudulent EIDL loans based on applications she prepared.

118. In addition, defendants Eric Rivera, Lisa Smith, James Wessels, Sieff Robert Sargeant, CC-1, and others participated in a scheme to make it falsely appear that businesses were spending a large portion of the PPP loan proceeds on payroll expenses so that the businesses would qualify for loan forgiveness—when in fact the businesses had few employees or payroll expenses.

119. In June 2021, after CC-1 received three PPP loans based on fraudulent applications, CC-1 discussed with defendants Lisa Smith and Eric Rivera about how

20

to structure the loan proceeds and paperwork to conceal that the proceeds were being spent on non-payroll expenses. Defendants Lisa Smith and Eric Rivera explained that defendant James Wessels could create payroll paperwork for CC-1's companies. CC-1 was in New Jersey when he had these conversations.

120.    Emails and text messages show that CC-1 provided defendant James Wessels with the identities of associates to be paid from CC-1's PPP loan proceeds and the amounts that each individual would receive. The amount paid via this "payroll" method totaled more than the 60 percent threshold for PPP loans to qualify for loan forgiveness. Defendant James Wessels then prepared Forms W4[8] to be completed by the individuals and then printed "payroll" checks and provided them to CC-1 to distribute. CC-1 acquired signatures on the Forms W4 and provided the "payroll" checks to the individuals. The individuals cashed the checks and returned most of the cash to CC-1. Defendant James Wessels also created Forms W2 to be distributed to the individuals. CC-1 was in New Jersey when he had these conversations with James Wessels and when he distributed the "payroll" checks.

121.    CC-1 paid $1,845 to defendant James Wessels via CashApp for the fake payroll checks and associated paperwork.

122.    Defendant James Wessels similarly produced fake "payroll" checks to defendant Sieff Robert Sargeant, who distributed the checks to associates who were not actually employees of Coach Sargeant Training. Defendant Sieff Robert Sargeant paid $1,475 to defendant James Wessels via CashApp for the fake payroll checks.

123.    In total, defendant James Wessels received at least $28,000 for creating false documents and payroll checks.

### C. Fraudulent Loan Forgiveness Applications

124.    As part of the conspiracy, defendant Lisa Smith submitted fraudulent loan forgiveness applications for fraudulent loans whose applications she had submitted. On October 4, 2021, CC-1 messaged defendant Lisa Smith to ask if he should submit the loan forgiveness applications for his companies that received PPP loans and defendant Lisa Smith responded, "YOU ARE NOT DOING YOUR FORGIVENESS". On October 5, 2021, CC-1 messaged defendant Lisa Smith the amount of the "payroll" expenses for defendant Lisa Smith to use on the forgiveness applications. On October 23, 2021, defendant Lisa Smith messaged CC-1, "I did the

---

[8] A Form W4 is an Employee's Withholding Certificate that permits an employer to withhold the correct federal income tax from the employee's pay.

forgiveness." CC-1 responded, "Ok did you put all 3 in?" and defendant Lisa Smith replied, "Yes".

125.    On October 26, 2021, defendant Lisa Smith submitted—and CC-1 electronically signed—a fraudulent PPP Loan Forgiveness Application for the Business-2 PPP loan. The PPP Loan Forgiveness Application indicated that Business-2 spent $88,450 (61 percent of the loan proceeds) on payroll costs from April 27, 2021 through August 27, 2021. However, as detailed above, the loan proceeds were not paid to actual employees, but rather were sent via check to CC-1's associates, who cashed the checks and returned most of the cash to CC-1. On or around October 26, 2021, the Business-2 PPP loan was forgiven based on the fraudulent forgiveness application.

126.    On October 26, 2021, defendant Lisa Smith submitted—and CC-1 electronically signed—a fraudulent PPP Loan Forgiveness Application for the Business-3 PPP loan. The PPP Loan Forgiveness Application indicated that Business-3 spent $92,950 (65 percent of the loan proceeds) on payroll costs from April 13, 2021 through August 5, 2021. However, as detailed above, the loan proceeds were not paid to actual employees, but rather were sent via check to CC-1's associates, who cashed the checks and returned most of the cash to CC-1. In October or November, 2021, the Business-3 PPP loan was forgiven based on the fraudulent forgiveness application.

127.    On December 6, 2021, defendant Lisa Smith submitted—and CC-1 electronically signed—a fraudulent PPP Loan Forgiveness Application for the Business-1 PPP loan. The PPP Loan Forgiveness Application indicated that Business-1 spent $79,300 (65 percent of the loan proceeds) on payroll costs from May 4, 2021 through August 28, 2021. However, as detailed above, the loan proceeds were not paid to actual employees, but rather were sent via check to CC-1's associates, who cashed the checks and returned most of the cash to CC-1. In December 2021, the Business-1 PPP loan was forgiven based on the fraudulent forgiveness application.

128.    On September 29, 2021, defendant Sieff Robert Sargeant emailed defendant Lisa Smith information—including the amount of Coach Sargeant Training's "payroll" expenses—for defendant Lisa Smith to use on the forgiveness application. On November 4, 2021, defendant Lisa Smith submitted—and defendant Sieff Robert Sargeant electronically signed—a fraudulent PPP Loan Forgiveness Application for the Coach Sargeant Training PPP loan. The PPP Loan Forgiveness Application indicated that Coach Sargeant Training spent $97,650 (66.43 percent of the loan proceeds) on payroll costs from May 28, 2021 through September 19, 2021. However, as detailed above, the loan proceeds were not paid to actual employees, but

rather were sent via check to defendant Sieff Robert Sargeant's associates, who cashed the checks and returned most of the cash to defendant Sieff Robert Sargeant. In November 2021, the Coach Sargeant Training PPP loan was forgiven based on the fraudulent forgiveness application.

129.    On October 26, 2021, defendant Lisa Smith submitted—and CC-5 electronically signed—a fraudulent PPP Loan Forgiveness Application for the Business-6 PPP loan.  The PPP Loan Forgiveness Application indicated that Business-6 spent $145,000 (100 percent of the loan proceeds) on payroll costs from April 20, 2021 through July 30, 2021.  However, as detailed above, a large portion of the loan proceeds was not paid to employees, but rather was wired to defendant Eric Rivera and CC-2.  On December 2, 2021, the Business-6 PPP loan was forgiven based on the fraudulent forgiveness application.